FILED _____ / ___ LODGED
_____ RECEIVED _____ COPY

AUG 2 2 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

TIMOTHY COURCHAINE
United States Attorney
District of Arizona
LATANYA L. WATELAND
Arizona State Bar No. 031747
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
LaTanya.Wateland@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| United States of America, | Case No. CV-25-3076-PHX-JJT |
|---|---|
| Plaintiff, | |
| v. | **VERIFIED COMPLAINT FOR FORFEITURE _IN REM_** |
| 1,176 Weapons and $11,777 in United States Currency, | **(Filed Under Seal)** |
| Defendants _in Rem_. | |

Plaintiff United States of America brings this complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions:

## BASIS FOR FORFEITURE

1.     This is a civil action _in rem_, brought to enforce the provisions of 18 U.S.C. § 924(d) for the forfeiture of firearms involved in or used in any knowing violation of 18 U.S.C. §§ 922(a)(6) and 2 (Aid and Abet Material False Statement During the Purchase of a Firearm).

2.     This is a civil action _in rem_, brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(c) for the forfeiture of any property, which constitutes or is derived from proceeds traceable to a violation of a "specified unlawful activity" as defined in 18

U.S.C. §§ 1956(c)(7) and 1961(1) (Trafficking in Firearms, 18 U.S.C. §§ 933(a)(1)), or a conspiracy to commit such an offense.

3.     This is a civil action *in rem*, brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(c) for the forfeiture of any property, which constitutes or is derived from proceeds traceable to a violation of a "specified unlawful activity" as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1) (Aid and Abet Straw Purchasing of Firearms, 18 U.S.C. 932(b)(1) and 2), or a conspiracy to commit such an offense.

4.     This is a civil action *in rem*, brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(c) for the forfeiture of any property, which constitutes or is derived from proceeds traceable to a violation of U.S.C. § 1956 (Money Laundering), or a conspiracy to commit such an offense.

5.     This is a civil action *in rem*, brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(A) for the forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (Money Laundering), or any property traceable to such a property.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction because the United States commenced this action and because this is an action for forfeiture. 28 U.S.C. §§ 1345, 1355(a).

7.     The Court has *in rem* jurisdiction because acts or omissions giving rise to the forfeiture occurred in the District of Arizona, and because venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1395 and 28 U.S.C. § 1355(b).

8.     Venue is proper in this District because acts or omissions giving rise to forfeiture occurred in this District, and because the property is located in this District. 28 U.S.C. §§ 1355(b), 1395(a), (b).

//

//

2

## DEFENDANT IN REM

9. The Defendant *in Rem* consists of 1,176 weapons (Items 1-1176) and $11,777 in United States currency (Item 1177) ("defendant property"). (*See* Attachment A).

10. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") seized the defendant property on April 29, 2025. The defendant property is currently in the custody of ATF.

## BACKGROUND OF FFLS AND STRAW BUYERS

11. According to the ATF, if you intend to engage in a business involving the dealing of firearms, you must apply for a Federal Firearms License ("FFL") from ATF.

12. FFLs are issued to eligible people in accordance with the Gun Control Act of 1968 ("GCA").

13. An FFL Dealer is any person engaged in the business of selling firearms at wholesale or retail; repairing firearms or fitting barrels, stocks, or trigger mechanisms to firearms (gunsmiths); or a pawnbroker (taking or receiving firearms by pledge or pawn as security for the payment or repayment of money).

14. It is vital that FFLs comply with all laws and regulations, both to protect their communities from violent crime and to maintain their licenses. Adhering to the statutory and regulatory requirements significantly contributes to ensuring public safety and the traceability of firearms. To maximize public safety, ATF will revoke the license of any dealer that commits a willful regulatory violation of the GCA, which includes:

    a.    Transferring a firearm to a prohibited person;

    b.    Failing to run a required background check;

    c.    Falsifying records, such as a firearms transaction form;

    d.    Failing to respond to an ATF tracing request; and/or

    e.    Refusing to permit ATF to conduct an inspection in violation of the law.

15.    ATF Special Agents ("Agents") know from training and experience that individuals involved in firearms trafficking will use numerous tactics to deceive FFLs, illegally purchase firearms, and avoid detection by law enforcement, to include:

   a.  Purchasing firearms with large amounts of cash;

   b.  Providing false information on their ATF Form 4473 (Firearms Transaction Record); and

   c.  Having straw buyers purchase the weapons for them.

16.    An ATF Form 4473 is a legally required document for the purchase of a firearm and helps to determine if the purchaser is allowed to own a firearm. The form is crucial in providing the information needed to perform background checks, maintain accurate firearms records, and allow for traceability of weapons used in crimes.

17.    ATF Form 4473 requires the purchaser to provide information regarding his/her identity, and answer, among others, the following questions: (a) whether he/she is the actual transferee/buyer of the firearms (the form notifies the transferee/buyer that he/she is not the actual transferee/buyer if he/she is acquiring the firearm on behalf of another person); and (b) whether he/she has ever been convicted in any court of a felony or any other crime for which the judge could have imprisoned him/her for more than one year, even if he/she received a shorter sentence including probation.

18.    ATF Form 4473 also requires the buyer to certify, among other things, (a) that his/her answers are true, correct and complete; (b) he/she understands that making false statements on the form is a crime; and (c) he/she understands that if he/she answers in the affirmative to certain questions, including the question about having been convicted of a felony, that he/she is prohibited from receiving or possessing a firearm.

19.    A straw buyer is a person who buys a firearm for a person who is legally prohibited from doing so.

20.    Agents in Arizona know from training and experience that Mexican Drug Trafficking Organizations ("MDTOs") will utilize straw buyers to purchase highly-

sought "armament-level firearms" that can be readily converted to belt-fed machine guns for use against the Mexican military, Mexican law enforcement, and rival MDTOs.

21.    An example of an armament-level firearm sought by MDTOs is the Barrett M82A1 .50 caliber rifle. It is a military-style weapon, and amongst the most powerful weapons a civilian can legally buy in the United States. The Barrett M82A1 measures about four feet long, weighs approximately 30 pounds, and can be fired by well-trained shooters up to 2,000 yards with relative accuracy. First sold in 1989 and known as an anti-material rifle - or a rifle utilized in battle to destroy enemy communications equipment, vehicles, weapons, and other heavy targets - the Barrett M82A1, in its many variations and types, has been utilized by numerous militaries in combat throughout the world, as well as law enforcement agencies, for over 30 years.

22.    According to Agents, in addition to the Barrett M82A1, other "weapons of choice" for MDTOs include:

a.    The Fabrique Nationale Herstal (FNH) M249S 5.56 x 45 mm belt-fed rifle (a semi-automatic commercially available version of the FNH M249 Squad Automatic Weapon (SAW));

b.    The Ohio Ordnance M2-SLR .50 caliber belt-fed rifle (a semi-automatic variant of the Browning M2 .50 caliber machine gun, colloquially referred to as the "Ma Deuce," that is typically mounted to a vehicle or aircraft due to its size, weight, and function); and

c.    The Ohio Ordnance M240-SLR 7.62 x 51 mm belt-fed rifle (a semi-automatic commercially variant of the FNH M240 medium machine gun).

23.    The majority of FFL dealers strictly follow gun sales laws and alert ATF when they suspect straw buyers attempting to purchase weapons. Some of the indicators of a straw buyer include persons buying expensive armament-level weapons with large sums of cash, buyers having little to no knowledge of the weapons or accessories they are

purchasing, and buyers providing false, inconsistent, or suspicious information on their ATF Form 4473s.

24. According to Agents, FFL dealers realize that abiding by gun laws not only protects their communities by prohibiting criminals from purchasing weapons but also allows FFLs to keep their licenses as they are subject to close oversight by ATF Industry Operations Investigators ("IOI").

25. IOIs support ATF's regulatory mission by conducting regular inspections and investigations into regulated firearms and explosives industries. IOIs work closely with new and existing FFLs to make sure their businesses meet all federal laws and regulations. They inspect FFL records and inventories to make sure all items are documented correctly and stored safely. During this process, they also look for evidence of trafficking and other criminal activities.

26. Unfortunately, Agents are also aware that unscrupulous FFLs in Arizona attempt to circumvent the law and sell weapons to straw buyers and MDTOs.

27. Instead of notifying ATF of suspicious purchases, they will "look the other way" and knowingly sell straw buyers guns. Other FFLs will go a step further by coaching prohibited persons they meet, and their straw purchasers, on how to illegally buy a gun and avoid detection by law enforcement. For instance, they tell straw buyers they, not their prohibited straw buyer handler, must physically give the cash to FFLs in a purchase. They will tell straw buyers they can only purchase a certain amount of a specific type of gun during a certain amount of time, in order to avoid law enforcement detection. They will tell straw buyers that their suspicious activity has been recorded on camera, and to come back on a different day to try again in in a less suspicious manner.

28. FFLs will also coach straw owners on how to fill out the ATF Form 4473, or completely fill out the form for them before they arrive, so all the straw buyer will have to do is sign the form. Some FFLs will arrange the price with the prohibited person and have the weapons ready for pick up when the straw buyer arrives, alleviating the need of

the straw buyer to negotiate a price or pick out the make and model of the guns – which straw buyers are typically unfamiliar with.

29.     Straw buyers working for MDTOs will often pay over twice the manufactured suggested retail price for armament-level firearms, thus giving FFLs a tempting financial incentive to break the law.

30.     Corrupt FFLs can further conceal straw buyer purchases by not reporting individual cash sales of over $10,000, as required by law.

31.     When MDTOs identify FFLs that will illegally sell them armament-level firearms via straw buyers, they tend to use them frequently and in large volumes, until they are stopped.

32.     Conversely, IOIs can often identify FFLs selling to straw buyers when the FFL begins to make several large cash sales for numerous armament-level firearms in a relatively short period of time.

**INTRODUCTION**

33.     Between November 10, 2023, and April 15, 2024, 14 different straw buyers purchased 85 weapons for $515,465 in cash, to include 60 armament-level firearms, from Baseline Pawn (also referred to as Friendly Thrift & Pawn and Baseline Thrift and Bargains, LLC). Thirteen of the 14 straw buyers spent more money on weapons purchased from Baseline Pawn than their annual incomes in 2023 (e.g. one spending $76,500 over a two-month period even though he made only $1,190 in reported income in 2023). Seven straw buyers admitted to Agents they were paid to purchase weapons for others and described in detail how assumed felons and prohibited buyers, and Baseline Pawn employees, guided them through the illegal purchase process.

34.     Three former employees said Baseline Pawn's FFL Responsible Person ("RP"), Tony-Khalid Salem, routinely pressured employees to coach and sell weapons to straw buyers and that he would illegally make sales in other employees' names in their absence from the store or different gun show locations.

35. Multiple workers from Baseline Pawn made sales of armament-level firearms to confidential sources and informants for ATF who presented themselves as straw buyers for felons. The workers coached the assumed straw buyers and felons through the process, to include falsifying ATF Form 4473s.

36. Four of the 85 weapons sold to straw buyers were found at crime scenes in Mexico, one as quickly as 18 days later. Two other weapons sold were found at crime scenes in Arizona.

37. Lastly, undercover ATF sources and informants performed four separate straw buys from Baseline Pawn for weapons between October 8, 2024, and March 28, 2025.

38. Based on the illegal dealings by Baseline Pawn of armament-level firearms and other firearms to straw buyers, ATF seized the defendant property as being involved in and/or the proceeds of multiple crimes, to include Aiding and Abetting Material False Statements During the Purchase of a Firearm, Trafficking in Firearms, Aiding and Abetting Straw Purchasing of Firearms, and Money Laundering.

## SUSPICIOUS ACTIVITY AT BASELINE PAWN

39. On April 15, 2024, ATF IOIs initiated a firearms compliance inspection of Baseline Thrift & Bargains, LLC, FFL #9-86-15394, a Type 02 Pawn Dealer. The business is located at 691-695 West Baseline Road, Phoenix, Arizona 85041, and is a strip mall-style business. The business is also known as Baseline Pawn and Friendly Thrift and Pawn and is listed with the Arizona Corporation Commission as Baseline Thrift & Bargains, LLC.

40. S. Henry Salem is listed as the registered agent and manager of Baseline Thrift & Bargains, LLC. The inspection was closed on June 27, 2024.

41. The inspection resulted in three violations, including:

    a. Failure to execute ATF Form 4473 and conduct a background check (or obtain a valid exemption to the National Instant Criminal Background Check System (NICS)) to a responsible person (RP);

8

b.    Failure to report multiple sales in more than five (5) instances; and

c.    Failure to timely report a theft/loss of firearms to ATF.

42.    A warning letter was issued to the Licensee, and a criminal investigation was opened. The listed responsible person ("RP") of Baseline Pawn was Tony-Khalid Salem. Tony-Khalid Salem is also the RP of FFL Big Bro LLC, a Type 01 firearms dealer. Tony-Khalid Salem's business location for Big Bro LLC is his residence, 4745 East Charles Drive, Paradise Valley, Arizona 85253. Tony-Khalid Salem utilizes the same phone number for Big Bro LLC as Baseline Pawn.

43.    ATF Form 7 defines a responsible person as any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of a sole proprietorship, corporation, company, partnership, or association, insofar as they pertain to firearms.

44.    Between November 10, 2023, and April 15, 2024, ATF found that 14 different suspected straw buyers purchased 85 weapons for $515,465 in cash, to include approximately 60 armament-level firearms, from Baseline Pawn. Thirteen of the 14 straw buyers spent more money on their weapons purchased from Baseline Pawn than their annual incomes in 2023. All bought at least one armament-level, belt-fed or .50 BMG caliber firearm in cash valued for more than $10,000. Six of the weapons were later found at crime scenes in Mexico and Arizona.

45.    Examples include:

| Straw Buyer | Weapons Purchased | Amount Spent | 2023 Income |
|---|---|---|---|
| Luis Angel Acosta | 1 | $34,999.99[1] | $9,407.16 |
| Isabel Felix Felix | 13 | $43,985 | $7,736 |
| Ricardo Arturo Flores Ruiz | 1 | $10,000[2] | $12,063 |
| Johnny Salazar Fragoso | 15 | $72,000 | $8,123 |

[1] On April 9, 2024, Luis Angel Acosta ("Acosta") purchased an Ohio Ordnance Works, M2-SLR .50 caliber rifle for $34,999.99 from Baseline Pawn, approximately double the Manufacturers Suggested Retail Price ("MSPR") of $17,298.85. In the Agents' training and experience, it is common for MDTOs to pay as much as double the price to FFLs via straw buyers for armament-level weapons.

[2] According to the Agent, this is an estimated amount for the price of this gun. A receipt for this transaction was not found at Baseline Pawn.

| Ruben Franco | 13 | $60,500 | $6,028 |
|---|---|---|---|
| Carlos Alexis Garcia | 4 | $18,500 | $1,760 |
| Airam Fabiola Gonzalez | 5 | $17,500 | $12,796 |
| Hagen Wayne McDowell | 8 | $76,500 | $1,190 |
| Juan Morales | 19 | $61,980 | $8,048 |
| Edwin Omar Noriega | 1 | $15,000 | $0 |
| Dominque Latrice Randolph | 1 | $19,000 | $6,557 |
| Orfa Ester Perez Romero | 2 | $36,500 | $7,11 |
| Sebastian Urueta | 1 | $15,000 | $6,404 |
| Alondra Angeles Vasquez Munoz | 1 | $34,000 | $368 |

46. IOIs also made and submitted 10 suspicious activity reports ("SARs") involving 24 different subjects who made suspicious purchases from Baseline Pawn. A SAR typically flags large or unusual cash transactions.

47. Based on the Agents' training and experience, FFLs that sell an unusually large amount of armament-level weapons for large sums of cash in a short amount of time, to persons who have little to no income, are likely selling weapons to straw buyers.

## STRAW BUYER INTERVIEWS

48. To further investigate straw purchases at Baseline Pawn, Agents interviewed several persons who made suspicious gun buys at the business. The following admitted that they were straw buyers at Baseline Pawn and that Baseline Pawn employees and prohibited possessors (Mexican Nationals and/or convicted felons) assisted and guided them through the buying process. There were similarities in many of the straw buys at Baseline Pawn.

49. Straw buyers were paid by handlers to make the purchase. Their handlers would often accompany straw buyers to Baseline Pawn, give them large amounts of cash to pay for the weapons before entering the shop, and specify which weapons to purchase. In many cases, handlers arranged with Baseline Pawn employees before the straw buyer arrived, to include having the specific weapons set aside and ready for pick up for a pre-arranged price. Baseline Pawn employees would also instruct the straw buyer on exactly how to fill out the ATF Form 4473 or have the ATF Form 4473 already completed before the straw buyer's arrival (except for the straw buyer's signature).

10

50.    Some of the weapons purchased were found at crime scenes in Mexico or Arizona within a few weeks.

***Ruben Franco***

51.    Between February 17, 2024, and June 5, 2024, Ruben Franco ("Franco") purchased 13 Century Arms International VSKA 7.62 x 39 mm rifles, three FN Herstal M249S 5.56 x 45 mm rifles, and one Barrett M82A1 .50 caliber rifle from Baseline Pawn.[3] In total, Franco spent approximately $78,000 in cash purchasing firearms from Baseline Pawn over four months. Three of the VSKA rifles purchased by Franco have been recovered at crime scenes in Mexico, with time to crime ("TTC") as low as 61 days from the dates of purchase. Franco's last reported wages to the State of Arizona from the third quarter of 2023 totaled $6,028.

52.    On October 11, 2024, Franco admitted in an interview to Agents that he was behind on his bills and began straw purchasing on behalf of somebody else in exchange for money. Franco said every firearm he purchased from Baseline Pawn was a straw purchase and he paid in cash each time with money given to him by someone else. Franco said every gun he purchased from Baseline Pawn went to two males that he believed were from Mexico because neither of them spoke English.

***April Diane King***

53.    On January 13, 2025, April Diane King ("King") bought an Ohio M240-SLR 7.62 x 051 mm rifle and a 5.56 x 45 mm FNH M249S rifle. King paid $32,000 cash for the two firearms.

54.    On February 12, 2025, Agents interviewed King. King's reported wages for all of 2023 and 2024 combined were approximately $15,000. King admitted that the large purchase from Baseline Pawn was a straw buy. King showed Agents text messages outlining how she was recruited and paid for her straw purchase. King said she went to

---

[3] The total amount of weapons Ruben Franco purchased was shown to be slightly larger on June 5, 2024 (17 weapons) than on April 15, 2024 (13 weapons), because he had made additional purchases since IOI began its inspection on April 15, 2024.

11

Baseline Pawn with an unknown man for the purchase and the man gave her the $32,000 in cash, which she hid in her shirt before entering the business.

55.    King identified the employee she bought the guns from as Mario Daniel Becerra ("Becerra"). She said she never spoke to Becerra or told him that she was there to buys guns, but he instead spoke in Spanish to the male who came with her to arrange the purchase. King said the only interaction she had with Becerra was when she gave him her Arizona identification and gave Becerra the $32,000 in cash to be counted in a money counter machine.

56.    When asked who completed and signed the ATF Form 4473, King said it was already all filled out for her. All she had to do was sign it.

57.    King said this purchase was very different to her because other FFLs she purchased guns from required her to fill out the ATF Form 4473 on her own.

*Jacquline Lizzette Avila*

58.    Between March 12, 2024, and March 25, 2025, Jacquiline Lizzette Avila ("Avila") purchased 18 Century Arms VSKA 7.62 x 39 mm rifles at Baseline Pawn, to include 10 VSKA rifles in a single multiple-weapon sale on March 25, 2025.

59.    Avila said she made every purchase as a straw buyer. She said she travelled to Baseline Pawn with the same man who arranged for her to buy the guns, and he took them after the buy was completed. She stated he gave her the cash for the purchase before they entered the store.

60.    Avila said when she entered Baseline Pawn, her handler came in the store with her. Avila said he alone spoke to the store employees and she did not interact with them until she was called over to complete the ATF Form 4473. Avila stated she did purchases in this manner with the same handler on two occasions, and that he helped her carry the firearms out of the store with her.

61.    Avila said she later went into the store by herself as a straw buyer, the employees at that point knew what she why she was there, and the employees were okay

12

with the gun purchase. When asked if that meant the employees knew she was a straw buyer making purchases for the male subject, she said "Yeah."

62. Three of the VSKA rifles purchased by Avila from Baseline Pawn have been recovered at crime scenes in Mexico, with a TTC as short as 60 days.

63. Avila went to Baseline Pawn on four separate occasions in March 2024.

***Ricardo A. Flores Ruiz***

64. In November 2023, Ricardo A. Flores Ruiz ("Flores Ruiz") bought a Barrett M82A1 .50 caliber rifle from Baseline Pawn for approximately $10,000.

65. On May 20, 2024, Flores Ruiz told Agents he bought it for "my brother's dad" who was a felon. Flores Ruiz then clarified that it was his half-brother's father and his half-brother was the one who requested the straw purchase. Flores Ruiz said he was paid $1,000 to be a straw buyer and they provided him with the cash for the purchase.

66. Flores Ruiz said the two men asked him to do it again, but he said no.

***Airam Fabiola Gonzalez***

67. On November 20, 2023, Airam Fabiola Gonzalez ("Gonzalez") bought a Barrett 82A1 .50 caliber rifle from Baseline Pawn. The firearm was recovered 63 days later, on January 22, 2024, at a crime scene in Mexico.

68. On July 30, 2024, Agents interviewed Gonzalez. Gonzalez was initially hesitant to answer whether she bought the Barrett 82A1 for someone else. However, she later said her ex-boyfriend Israel Flores Vega ("Flores Vega") asked her to make the purchase. She said he did not pay her to make the straw purchase but was unsure if someone was paying him.

69. Gonzalez said Flores Vega was unable to purchase weapons because he was a Mexican National from Sinaloa, so he asked her to buy the firearm. He told her she would not get into trouble.

70. Gonzalez said she and Flores Vega went into Baseline Pawn together.

71. Gonzalez said that Flores Vega gave her the cash needed for the straw purchase and the gun information before they went into the store.

13

72. Gonzalez thought Flores Vega had spoken to a Baseline Pawn employee before they arrived because the employee already knew what they were going to purchase and seemed to be expecting them.

73. Gonzalez said after the purchase they took the gun to Flores Vega's residence, and she never saw it again.

74. Gonzalez said she helped Flores Vega with straw buys on about three occasions.

75. Records showed that Gonzalez purchased five AK style rifles on February 24, 2024, at Baseline Pawn for $17,500. Records also showed Gonzalez made $12,796 income in 2023.

76. Gonzalez acknowledged that she made a February 24, 2024, straw buy for Flores Vega, he gave her the cash before she went into Baseline Pawn for the purchase, and she worked with a Hispanic employee during the transaction. She stated that during the February 24, 2024, straw buy handler Flores Vega stayed outside of the store while she made the purchase.

77. Gonzalez believed that Flores Vegas had called Baseline Pawn on her behalf before this purchase because when she went into the shop by herself the guns were already set aside by the employees and ready for her to pick up and buy.

78. Gonzalez also showed Agents text messages, a text with a picture, and a voice mail Flores Vega left Gonzalez in which he had requested she or a friend buy more weapons at Baseline Pawn for him. Gonzalez said she never responded to him.

79. Gonzalez said Flores Vega was currently in jail. Records showed he was arrested on May 7, 2024, for multiple felony charges by the Arizona Department of Public Safety.

*Maria Elana Acosta Telles*

80. On July 19, 2024, Maria Elana Acosta Telles ("Acosta Telles") bought a FN M249S rifle for approximately $18,416.21 from Baseline Pawn.

14

81. On July 27, 2024, Acosta Telles bought an Ohio Ordnance M240 rifle from Baseline Pawn for approximately $24,000.

82. On August 2, 2024, Agents interviewed Acosta Telles with her son Jonathan Silva ("Silva") present.

83. Acosta Telles said she bought two large weapons, one for approximately $25,000, and the other for $18,000. Agents said they did not understand how Acosta Telles could afford such purchases since she had no reported income in Arizona. Acosta Telles said she made money under the table.

84. Acosta Telles said that when she went to buy the weapons, she was with a man named Armando, he drove her to the shop and stayed outside in his car, and when they each returned home, he kept the weapons with him.

85. When Acosta Telles was questioned about why Baseline Pawn did not use an address she lived at on her ATF Form 4473, she said she told Baseline Pawn it was incorrect.

86. Agents did not believe Acosta Telles was being forthcoming as she was describing the actions of a straw buyer.

87. Silva, witnessing Acosta Telles' questionable responses to the Agents, told his mother to just tell the Agents the truth. That he was going to tell them everything.

88. At this time, Acosta Telles admitted that Armando gave her the money to purchase the weapons from Baseline Pawn. She stated Armando told her which guns to buy, and she knew nothing about guns.

89. Silva then gave the Agents Armando's phone number and description.

90. Acosta Telles admitted she received $500 each time she was a straw buyer.

91. Silva and Acosta Telles said they thought Armando could not buy the guns himself because he was from Mexico.

92. Silva was interviewed as well.

93. On July 19, 2024, Silva purchased a FN M249S rifle from Baseline Pawn. Silva said he did it as a straw buyer for Armando.

15

94.    Silva said he was behind on his rent and needed the money. Armando gave Silva the money needed for the straw buy and described the weapon to purchase.

95.    Silva said when he went in the store and told the chubby short-haired-Hispanic-male employee what gun he wanted, the employee responded "OK." Silva said the employee told him the requested weapon was in a box in the back and Silva could not open and look at it since he was going to buy it.

96.    Silva said he used the $20,000 Armando gave him to make the straw purchase. Silva said Armando paid him $1,300 for being a straw buyer.

97.    Silva said Armando was getting ripped off by buying that specific gun for $20,000, but figured it was not Silva's money, so he did not worry about it.

98.    Silva said he did not have to fill out any of the ATF Form 4473. All he had to do was sign the form because it was already pre-filled for him.

**_Angelica Andrea Jacques_**

99.    On June 16, 2024, Angelica Andrea Jacques ("Jacques") bought a Century Arms, VSK 7.62 x 39 rifle from Baseline Pawn. Twenty-three days later the gun was found at a crime scene in Sonora, Mexico.

100.    On August 23, 2024, Agents interviewed Jacques and told her that they investigated firearms-related crimes.

101.    Jacques said that she and her ex-boyfriend Jose bought three guns.

102.    Jacques stated she and Jose went to two different gun shows and he gave her $3,000 to buy guns while there. She said when it was time to buy and pay for the guns from Baseline Pawn's stand, Jose would hand her the cash from his pocket. She said Jose picked out the guns. She believed the employees saw her receive the cash from Jose before making the purchase.

103.    She said Jose did not pay her to buy the guns.

104.    When shown an ATF Form 4473 she had signed, Jacques began to cry. Agents advised that Jose was likely taking advantage of other females to get them to straw buy as well.

16

**INTERVIEWS WITH FORMER BASELINE PAWN EMPLOYEES**

*Daniel Stewart*

105.    On June 18, 2024, former Baseline Pawn employee Daniel Stewart ("Stewart") spoke to Agents.

106.    Stewart said he began working at Baseline Pawn on or around June of 2023. Stewart said he was hired by FFL RP Tony-Khalid Salem and that Tony-Khalid Salem does all the hiring. Stewart said Tony-Khalid Salem had certain guns extremely overpriced. Stewart expressed concern to Tony-Khalid Salem that the prices at the store are ridiculous and people who are willing to pay that much money are not people the business should be dealing with.

107.    Stewart said Tony-Khalid Salem vehemently disagreed. Tony-Khalid Salem's gun sales theory was if a straw buyer made a purchase from Baseline Pawn, it was ATF's responsibility to catch the straw buyer, not Baseline Pawn's. Tony-Khalid Salem said if Baseline Pawn completed the multiple firearms sale form for a straw buyer, and reported the information to ATF, it was up to ATF to catch them. Stewart said Tony-Khalid Salem only cared if the buyer (including straw buyers) passed the National Instant Criminal Background Check System ("NICS"), then Tony-Khalid Salem would sell the gun.

108.    Stewart said he also thought Tony-Khalid Salem was manipulating Baseline Pawn's entries into the Bravo Store System to avoid ATF's detection of straw purchases. The Bravo Store System is a comprehensive point-of sale ("POS") and business management software designed for gun retailers, pawn shops, and other specialty retailers. According to Bravo Store Systems, businesses use it to streamline operations, ensure ATF compliance, and enhance customer experience.

109.    Stewart said he was working a gun show in Kingman, Arizona for Baseline Pawn, while simultaneously Tony-Khalid Salem was working a gun show in Yuma, Arizona on the same day. Stewart said that NICS background checks and ATF Form 4473s were being completed under Stewart's name at the Yuma gun show in which

Stewart was not physically present. Stewart said Tony-Khalid Salem had access to everyone's point of sale (Bravo Store System) accounts that the business utilized to process information from NICS background checks and ATF Form 4473s. Stewart believed Tony-Khalid Salem was making these entries under names other than his own to conceal Tony-Khalid Salem's involvement from law enforcement.

110.    Stewart said Tony-Khalid Salem approved all sales of firearms at Baseline Pawn for all employees, including the overpricing of firearms and sales to straw buyers. Stewart said Tony-Khalid Salem believed if the buyer came back with a NICS approval (criminal background check), his employees should do the sale and ignore all other straw purchasing signs.

111.    Stewart's description of Tony-Khalid Salem's way of treating straw buys was consistent with the confidential purchases ATF later made on February 15, 2025, and February 22, 2025 (to be discussed below), the accounts of other employees, as well as the testimonies of seven Baseline Pawn straw buyers interviewed by ATF.

***Rodney Doane***

112.    On November 12, 2024, and on June 27, 2025, Agents conducted phone and video interviews with former Baseline Pawn employee Rodney Doane ("Doane").

113.    Doane contacted ATF to request an investigation be started on Baseline Pawn. Doane expressed concern that Baseline Pawn was selling M2 belt-fed rifles for $30,000 to $35,000, when someone could go to Ace Hardware and purchase the same firearm for $9,500. Doane said another employee told Tony-Khalid Salem we cannot be doing these straw purchases, and Tony-Khalid Salem "blew up" at him. Doane said the employee got fired shortly thereafter. Doane stated Tony-Khalid Salem was attempting to insulate himself from personally performing suspicious straw purchases at Baseline Pawn by requiring employees to conduct transactions for him.

114.    Doane said he was hired by Tony-Khalid Salem and received no training on identifying straw purchasers, completing ATF Form 4473s, and/or completing FinCEN Form 8300s (A FinCEN Form 8300 is required by the Internal Revenue Service for

18

businesses when they receive cash payments over $10,000). Doane said the only question he was required to ask as an employee was, "Is this gun for you?" Doane said Tony-Khalid Salem was grossly overpricing firearm sales, as much as $20,000 over MSRP. Doane also said employee Freddy Granado ("Granado") was writing down phone numbers and exchanging text messages with "Mexican Nationals" that would be prohibited possessors for firearm purchases.

115. On June 27, 2025, Doane told Agents about a particularly disturbing purchase that occurred on March 2, 2024, at a Tucson gun show. This involved a purchase by Marcus Amir Jefferson ("Jefferson") of a M2 rifle for $31,580 cash. Doane told Agents this purchase was above and beyond suspicious and made Doane uncomfortable as an employee. Doane said that a subject negotiated the price of the firearm with Tony-Khalid Salem before leaving. Doane said a completely different person (Jefferson) returned with $35,000 cash in a bag asking to buy the same gun. Doane said that Tony-Khalid Salem had another employee, Nicholas Pavelich ("Pavelich"), be the go-between guy for that purchase. Pavelich completed the ATF Form 4473 for Jefferson.

116. Doane said Tony-Khalid Salem would stand in the background and give a price, then turn back around in an effort to not witness the transaction.[4] Doane acknowledged that he believed he would be investigated himself based on how the business was being operated.

117. Interestingly, during the purchase at the Tucson gun show on March 2, 2024, by Jefferson that Doane recalled, law enforcement happened to be conducting surveillance. Agents observed activity consistent with Doane's statements, in which Eduardo Enriquez Torres and Jefferson completed what appeared to Agents to be a straw purchase. An interdiction occurred that same day, and the M2 rifle was seized by Agents. This surveillance was unrelated to the Baseline Pawn investigation at the time, as the

---

[4] This behavior was consistent with what Agents observed on February 15, 2025, for a controlled purchase by an ATF confidential informant from Baseline Pawn involving Tony-Khalid Salem.

investigation into the business had not yet been opened and the Tucson gun show was outside of the Phoenix metropolitan area.

118.  Doane said Tony-Khalid Salem was keenly aware when a straw purchase was occurring and was nervous even when he was having his employees conduct them at his direction from a distance.

119.  On October 14, 2024, Doane was working at a gun show with Granado and Tony-Khalid Salem. Doane said a purchase occurred for $16,000 cash for a M249S rifle. Doane said Tony-Khalid Salem was so uncomfortable with the sale appearing to be a straw purchase, that Tony-Khalid Salem went out to his truck to wait for the purchase to conclude and for the straw buyer to leave. Doane provided text messages from Tony-Khalid Salem that backed up these statements. Doane said Granado was present during the purchase. The purchaser was identified as Eric Wilson ("Wilson"). Wilson passed his background check and the sale was approved. Wilson signed the ATF Form 4473 as the buyer and the firearm was transferred. Becerra signed the ATF Form 4473 as the transferee despite not being physically present for the transaction. Doane said he completed the firearm transaction, meaning the ATF Form 4473 was falsified with Becerra's signature.

**Jordan Daviet**

120.  On May 19, 2025, former Baseline Pawn employee Jordan Daviet ("Daviet") was interviewed. Daviet said he began working at Baseline Pawn on or around April of 2024. Daviet said the firearm prices were set high on purpose by the Salems, meaning Henry Salem and Tony-Khalid Salem. Daviet acknowledged that Baseline Pawn was selling firearms as high as 60 percent to 100 percent over MSRP. Daviet said Tony-Khalid Salem did not train him on recognizing indicators of straw purchasing, despite being the responsible person for the FFL, nor did Henry Salem. Daviet said that Tony-Khalid Salem's viewpoint was about no matter who it was, employees needed to do the sale, in reference to approving transactions.

20

**UNDERCOVER STAW PURCHASES BY ATF AT BASELINE PAWN**

*Straw Buy #1*

121. On October 8, 2024, Agents acting in an undercover ("UC") capacity attempted to purchase four AK style rifles from Baseline Pawn from employee Becerra. Employee Gustavo Cano ("Cano") was also present and observed the interaction inside the store. The male UC negotiated the firearm deal with Becerra. The female UC completed the ATF form 4473 for the purchase. However, Becerra denied the sale and advised the female UC to return the following day and ask for the firearms. The female UC returned on October 9, 2024, and the sale was approved and completed. Becerra clearly recognized this to be a straw purchase but allowed the transaction to be completed the following day.

*Straw Buy #2*

122. On February 15, 2025, at a gun show in Tucson, Arizona, a confidential informant ("CI") and a female confidential source ("CS") approached Baseline Pawn. The CI asked Tony-Khalid Salem to do a private sale for a Colt pistol for $4,600. Tony-Khalid Salem informed the CI he could not do private sales and was an FFL. The CI told Tony-Khalid he could not pass a background check for the purchase of a firearm. Tony-Khalid Salem told the CI he could not do the sale, and specifically stated it was against the law. The CI was present with the female CS during this conversation. The CI asked Tony-Khalid Salem if the female CS could buy the firearm on his behalf. Tony-Khalid Salem told the CI he would not be able to do this sale either.

123. Approximately one hour later, the CI and the female CS returned to Baseline Pawn. This time, Tony-Khalid Salem allowed the purchase to proceed, and acknowledged the previously agreed upon price of $4,600. Tony-Khalid Salem signed ATF Form 4473 for the purchase, which was also completed by the female CS as the buyer. Tony-Khalid Salem ignored signs of this transaction being a straw purchase after being told by the CI that they could not pass a background check. Tony-Khalid Salem later allowed the female CS straw purchaser to complete ATF Form 4473, because as a

21

straw buyer, she would likely pass the background check. The background check received a proceed and the transaction was approved.

124.    Tony-Khalid Salem's actions were consistent with his instructions to his employees about approving sales if the person doing the NICS check can pass a background check.

*Straw Buy #3*

125.    On February 22, 2025, at a gun show in Phoenix, Arizona, a CI negotiated with Becerra the purchase of a M249S rifle for $15,000 cash. The CI told Becerra twice that he was a felon. The CI informed Becerra he was with a female that could help him out and do him the favor. Becerra told the CI to give the cash for the firearm to her. The female CS then went back to Baseline Pawn and completed the transaction for the M249S rifle. While completing ATF Form 4473, Granado instructed the female CS on how to complete and falsify ATF Form 4473. Granado remembered the female CS from the previous weekend in which Tony-Khalid Salem approved a straw purchase on February 15, 2025.

*Straw Buy #4*

126.    On March 28, 2025, a confidential informant facilitated a straw purchase with Becerra via the messaging application "WhatsApp" for a Barrett .50 caliber rifle for $14,000 cash. Becerra stated he needed to ask to get the price approved. Through interviews, former Baseline Pawn employees Doane, Stewart, and Daviet advised that Tony-Khalid Salem sets the prices and approves all large gun transactions of this nature. The confidential informant told Becerra that a female would be coming by the store to purchase the firearm on his behalf. The female, who was an ATF undercover agent, entered the store on March 28, 2025. During this time, Tony-Khalid Salem was present inside the store, as was Becerra. The transaction was approved, despite being facilitated by a felon confidential informant. Becerra was aware the confidential informant was a felon.

127.    On April 22, 2025, Becerra and Granado were indicted under seal for Aid and Abet Material False Statement During the Purchase of a Firearm, Trafficking in

22

Firearms, and Aid and Abet Straw Purchasing of Firearms. *U.S. v. Mario Daniel Becerra and Freddy Granado, CR 25-00598-PHX-JJT, United States District Court for the District of Arizona.*

### S. HENRY SALEM VIOLATES 31 U.S.C. § 5331, FAILS TO REPORT $1,700,000 IN CASH RECEIPTS

128.    S. Henry Salem is the statutory agent and manager of Baseline Thrift & Bargains, LLC. According to the Arizona Corporation Commission, Baseline Thrift & Bargains, LLC has no other managers or members in the LLC.

129.    On August 11, 2020, November 6, 2020, and June 28, 2024, S. Henry Salem signed acknowledgments to ATF that he would, as required by federal law, complete and file IRS FinCEN Form 8300s for every cash receipt over $10,000 for Baseline Thrift & Bargains, LLC.

130.    Between October 29, 2023, and March 27, 2025, Baseline Pawn received 255 cash payments greater than $10,000 for firearm purchases. IRS FinCEN Form 8300 was filed 162 times, reporting approximately $3,000,000 in cash receipts. However, IRS FinCEN Form 8300s were not filed 93 times for cash purchases of guns greater than $10,000, resulting in approximately $1,700,000 in unreported cash receipts.

### BROTHERS S. HENRY SALEM AND TONY-KHALID SALEM AWARE OF STRAW PURCHASES AT BASELINE PAWN

131.    According to Agents, brothers S. Henry Salem and Tony-Khalid Salem knew straw purchases were occurring at Baseline Pawn.

132.    Despite being an FFL RP, based upon undercover buys, interviews with employees and straw buyers, and numerous unreported cash purchases for armament-level weapons up to double their normal price, it was clear Tony-Khalid Salem repeatedly ignored ATF guidelines and systematically and routinely sold armament-level weapons to straw buyers, or intimidated employees into doing the same.

133.    S. Henry Salem, as the owner of an FFL business, was also aware that straw purchases were occurring. At the conclusion of ATF IOI investigation in 2024, S.

23

Henry Salem signed an ATF "Warning Acknowledgment" on June 28, 2024. According to Agents, the purpose of the warning acknowledgment is to inform the FFL business owner of all the violations found by ATF and for the FFL owner to acknowledge the violations and state how they would remedy them. The violations S. Henry Salem acknowledged and said he would correct at the time were:

    a.    Failure to execute ATF Form 4473 and conduct a background check (or obtain a valid exemption to the National Instant Criminal Background Check System (NICS)) to a responsible person (RP);

    b.    Failure to report multiple sales in more than five (5) instances; and

    c.    Failure to timely report a theft/loss of firearms to ATF.

134. Despite this acknowledgment on June 28, 2024, by S. Henry Salem, Baseline Pawn continued to sell to straw buyers the remaining of 2024 into early 2025, highlighted by four undercover controlled straw purchases by ATF in October 2024 and March, April, and May 2025.

135. Additionally, like Tony-Khalid Salem, S. Henry Salem was surely aware of the huge increase in revenue for Baseline Pawn based on the sales of straw buys, to include over $500,000 in early 2024 alone. S. Henry Salem and Tony-Khalid Salem also under reported $1.7 million in cash purchases to the IRS – showing knowledge of, and an intent to, hide suspicious revenue from authorities.

136. Agents also have video footage of S. Henry Salem causally observing and condoning a straw buy at Baseline Pawn that occurred on October 18, 2024.

137. Surveillance footage from the parking lot outside Baseline Pawn shows identified straw buyer handler Sonni Blue Nikai Joe ("Joe") and straw buyer Sebastian Elias Macias ("Macias") arriving together in a 2008 blue Dodge Charger.

138. Soon thereafter, Agents observed the following from the business' digital video recorder.

139. First, Joe enters the store alone and walks up to the counter where employees Becerra, S. Henry Salem, and Jesus Carrasco ("Carrasco") are standing behind

24

the counter. Joe begins speaking to Becerra, at which point S. Henry Salem immediately walks away towards the center of the store.

140.    Then, approximately 14 seconds later, Becerra turns around and grabs an ATF Form 4473 and places it on the counter. Joe continues talking to Becerra, briefly turns around in the direction of S. Henry Salem, and shortly thereafter exits the store. Becerra keeps the ATF Form 4473 on the counter and remains standing in that position. S. Henry Salem can be seen standing in the middle of the store observing the interaction.

141.    Next, just over a minute later, identified straw purchaser Macias enters the store alone carrying a small green bag with cash and approaches Becerra. S. Henry Salem can be observed watching Macias enter the store and walk towards the sale counter to speak with Becerra. Becerra immediately begins pointing to the ATF Form 4473 and appears to begin explaining the form to Macias (this is within two minutes of Becerra speaking to Joe). Becerra hands Macias a pen and Macias starts completing the ATF Form 4473. S. Henry Salem is clearly visible in the center of the store observing the obvious straw buy. Macias does not view any firearms in the store and immediately begins filling out AFT Form 4473 upon entering Baseline Pawn.

142.    After a short while, Macias hands the ATF Form 4473 back to Becerra, who can be seen filling out the rest of the form. Macias hands his Arizona identification to Becerra who reviews it. Macias remains at the counter while Becerra is operating on one of the store's computers. Macias then hands Becerra a green bag. Becerra opens the bag which is full of a large quantity of cash.

143.    Becerra hands the ATF Form 4473 back to Macias who appears to sign or write down additional information on the form. S. Henry Salem is still standing in the center of the store observing what is occurring at the counter during the entirety of the illegal transaction and transfer. During this time, employee Carrasco goes and retrieves the firearm (seen in a large black pelican case) from the back of the store and leans it upright behind the counter. The transaction completed by Macias on October 18, 2024, was for approximately $26,000 cash.

144. Finally, Becerra can be seen giving some cash back to Macias before bringing the firearm around the counter to transfer to Macias. The firearm, an Ohio Ordnance M2-SLR rifle chambered in .50 BMG caliber, is inside of a large black pelican case. Macias leaves the store and loads the firearm into Joes's vehicle.

145. Joe was later interviewed by Agents on January 22, 2025, and admitted to being involved in the facilitation of straw purchasing, which all occurred in the presence of S. Henry Salem. At no point did S. Henry Salem intervene to stop the illegal firearm transfer from occurring.

146. Based on the Agents' training and experience, the straw buy S. Henry Salem observed (and did nothing to prevent) was the most blatant and obvious type of straw buy an FFL might ever see, and the exact kind of illegal behavior FFLs are continually, and relentlessly, cautioned to detect and disrupt by ATF in its exhaustive training of FFLs.

147. According to the Agents, S. Henry Salem's behavior (immediately moving to the middle of the store, saying nothing, and calmly watching his employees sell an over-priced armament-level weapon for cash to an obvious straw buyer) shows S. Henry Salem knew the straw buy was occurring in his store.

### 1,388 BASELINE PAWN WEAPONS TRACED TO CRIMES

148. ATF operates the National Tracing Center ("NTC"). The NTC is the United States' only crime gun tracing facility. Its mission is to conduct firearms tracing to provide investigative leads for federal, state, local, and foreign law enforcement agencies.

149. Firearms tracing begins when law enforcement agencies discover a firearm at a crime scene and seek to learn the origin or background of that firearm to develop investigative leads.

150. Tracing is a systematic process of tracking the movement of a firearm from its manufacture or from its introduction into U.S. commerce by the importer through the distribution chain (wholesalers and retailers) to identify an unlicensed purchaser. That

information can help link a suspect to a firearm in a criminal investigation and identify potential traffickers.

151. The NTC also receives information from Mexican law enforcement regarding weapons recovered at crime scenes in Mexico.

152. According to the ATF, between August 1, 2024, to August 2025, 1,388 weapon owned and sold or traded by Baseline Pawn have later been traced to crimes by law enforcement.

153. Records also show that 189 of the weapons sold or traded by Baseline Pawn during that approximately 13-month period were traced to crime scenes in Mexico.

154. According to the Agent's training and experience, FFLs that have 1,388 weapons traced to crimes during a 13-month period (or approximately 106 per month) are likely knowingly assisting straw buyers to make illegal weapons purchases.

## SEIZURE OF DEFENDANT PROPERTY

155. On April 29, 2025, and based upon the illegal dealings by Baseline Pawn of armament-level firearms and other firearms to straw buyers, ATF seized the defendant property.

## SUMMARY

156. Based on the illegal dealings by Baseline Pawn of armament-level firearms and other firearms to straw buyers, ATF seized the defendant property as being weapons involved in, and/or weapons and/or other property that are the proceeds of, multiple crimes, to include Aiding and Abetting Material False Statements During the Purchase of a Firearm, Trafficking in Firearms, Aiding and Abetting Straw Purchasing of Firearms, and Money Laundering, for the following reasons:

    a.    Baseline Pawn selling 85 weapons, including approximately 60 armament weapons, for $515,465 to 14 people for cash during a five-month period;

    b.    Thirteen of the 14 suspected straw buyers spending more on their gun purchases than their entire 2023 reported individual incomes;

    c.    Six of the guns being bought by suspected straw buyers being found at crime scenes in Mexico and Arizona within weeks of purchase;

    d.    Interviews and admissions by seven different straw buyers to purchasing guns from Baseline Pawn for others, to include receiving assistance from both straw buyer handlers and Baseline Pawn employees;

    e.    Admissions from seven straw buyers that they made all payments in cash to Baseline Pawn;

    f.    Straw buyers knew little to nothing about the armament-level weapons they were buying;

    g.    Straw buyer handlers provided them with cash for the weapons purchased;

    h.    Straw buyer handlers appeared to know the Baseline Pawn employees;

    i.    Baseline Pawn employees either coached straw buyers on how to answer ATF Form 4473 questions or filled the forms out for them entirely (excluding signing their names);

    j.    Baseline Pawn employees - coordinating with straw buyer handlers - often set the weapons aside before the straw buyers made purchases and had an earlier agreed upon price;

    k.    The weapons bought by straw purchasers were turned over to their handlers once they acquired them;

    l.    ATF purchase records matching the descriptions given by the seven straw buyers (large armament-level weapons purchased with cash for prices as much as double the MSRP by persons with little to no income);

    m.    Interviews by three separate former employees of Baseline Pawn in which they said Tony-Khalid Salem regularly and systematically

pressured employees to sell armament-level weapons for cash to straw buyers representing felons and Mexican Nationals.

n.  The three employees' descriptions matched those of the admissions by the seven interviewed straw buyers and the sales history of Baseline Pawn.

o.  Additionally, despite his philosophy of the store selling as many weapons as possible to straw buyers, the employees said Tony-Khalid Salem manipulated the Bravo Store System to register sales to employees who did not make them, to try and "insulate" himself from straw purchases.

p.  The three employees said Tony-Khalid Salem still controlled and approved the sales of all armament-level guns at Baseline Pawn for all employees, to include allowing sales for up to double MSRP;

q.  Four controlled buys by undercover informants and sources of ATF who represented themselves as felons and Mexican Nationals and were allowed by Tony-Khalid Salem and other Baseline Pawn employees to purchase armament-level weapons for cash at exorbitant prices.

r.  The UCs descriptions of the straw buys matched the manner in which former employees and admitted straw buyers said they occurred;

s.  Falsified ATF Form 4473s;

t.  Unreported multiple-weapons purchases;

u.  S. Henry Salem and Tony-Khalid Salem failing to report IRS FinCEN Form 8300s 93 times for cash purchases of guns greater than $10,000, resulting in approximately $1,700,000 in unreported cash receipts;

29

v.     S. Henry Salem signing an ATF acknowledgment of straw buyer-related violations after an April 15, 2024, to June 28, 2024, investigation, and continuing to allow Baseline Pawn to make straw purchases thereafter;

w.     Video recording showing S. Henry Salem observing, and condoning, an obvious straw buy of an armament-level weapon for $26,000 cash on October 18, 2024; and

x.     1,388 firearms sold and/or traded by Baseline Pawn being traced to crimes (including 189 in Mexico).

## CLAIM FOR RELIEF

1.     The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 156 as those fully set forth herein.

2.     The defendants *in rem* (Items 1-1176) are subject to forfeiture pursuant to 18 U.S.C. § 924(d) as they are firearms involved in or used in any knowing violation of Aiding and Abetting Providing Materially False Information to a Federal Firearms Licensee in violation of 18 U.S.C. §§ 922(a)(6) and 2.

3.     The defendants *in rem* are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c) as they are any property which constitutes or is derived from proceeds traceable to a violation of Trafficking in Firearms, or a conspiracy to commit such an offense, in violation of 18 U.S.C. §§ 1956(c)(7), 1961(1), and 933(a)(1).

4.     The defendants *in rem* are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c) as they are any property which constitutes or is derived from proceeds traceable to a violation of Aiding and Abetting Straw Purchasing of Firearms, or a conspiracy to commit such an offense, in violation of 18 U.S.C. §§ 1956(c)(7), 1961(1), and 932(b)(1) and 2.

5.     The defendant *in rem* (Item 1177) is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c) as it is any property which constitutes or is derived from proceeds

30

traceable to a violation of Money Laundering, or a conspiracy to commit such an offense, in violation of 18 U.S.C. § 1956.

6.    The defendants *in rem* are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as they are any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (Money Laundering), or any property traceable to such a property.

WHEREFORE, the United States of America prays that process issue for an arrest warrant *in rem* of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United Sates of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and property, together with the costs and disbursements of this action.

DATED this 22nd day of August 2025.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

/S/ LaTanya L. Wateland
LaTanya L. Wateland
Assistant United States Attorney

31

## VERIFICATION

I, Barrett Pluskat, verify and declare under penalty of perjury that, I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, that I have read the foregoing Complaint for Forfeiture *In Rem* and know the contents, and that the matters contained in the Complaint are true to my own knowledge, except that those matters alleged upon information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case.

I verify and declare under penalty of perjury that the foregoing is true and correct. Executed on this 21st day of August, 2025.

Barrett Pluskat
Digitally signed by Barrett Pluskat
Date: 2025.08.21 14:45:52 -07'00'

Barrett Pluskat
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives